# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| IN RE NASH ENGINEERING | : | CIVIL CASE NO. |
| COMPANY | : | 3:24-CV-00640 (JCH) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - : | | |
| | : | |
| GEORGE I. ROUMELIOTIS, | : | |
| CHAPTER 7 TRUSTEE FOR | : | |
| THE NASH ENGINGEERING CO., | : | |
|      Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NASH ENGINEERING HOLDINGS, LLC, | : | JULY 15, 2024 |
| ET AL., | : | |
|      Defendants. | : | |
| | : | |

## RULING ON MOTION TO DISMISS (DOC. NO. 17)*

## I.    INTRODUCTION

Plaintiff George I. Roumeliotis ("Mr. Roumeliotis" or "Trustee"), Chapter 7 Trustee

of the bankruptcy estate of the Nash Engineering Company ("Nash Engineering"),

brings this action against Nash Engineering Holdings LLC ("Nash Holdings") and current

or former members of Nash Holdings, asserting claims of fraudulent transfers and

unjust enrichment.  See Amended Complaint ("Am. Compl."), Bankruptcy Case No. 23-

05022 (Doc. No. 20).

Before the court is a Motion to Dismiss filed by Nash Holdings and several, but

not all, former Nash Engineering shareholders.[1]  See Defendants' Motion to Dismiss

---

* The court is also issuing a Ruling on a Motion to Dismiss in a related case, No. 3:23-CV-01366
(JCH).  To the extent relevant, that opinion is incorporated into the instant Ruling.

[1] The defendants who filed the Motion to Dismiss jointly with Nash Holdings include: Alison Bly
Stein; Allen F. Gould and Howard S. Tuthill III, Trustees of M/B Enid A. Nash; Allen F. Gould and Daniel

1

("Mot.") (Doc. No. 17); Defendants' Memorandum in Support of Motion to Dismiss

("Mem.") (Doc. No. 17); see also Defendants' Reply to Opposition ("Reply") (Doc. No.

19).  The Trustee opposes this Motion.  See Trustee's Opposition to Motion to Dismiss

("Opp.") (Doc. No. 18).

For the reasons set forth below, the court grants in part and denies in part the

Motion to Dismiss.

## II.    BACKGROUND

As an initial matter, the court notes that the Trustee filed his Amended Complaint

nearly two weeks after the defendants filed their Motion to Dismiss.  See, infra, at

Section II.B.  An amended complaint normally supersedes the original complaint but

does not necessarily render a pending motion to dismiss moot.  See Pettaway v. Nat'l

Recovery Sols., LLC, 955 F.3d 299, 303 (2d Cir. 2020).  Courts in this Circuit have

discretion to deny the motion as moot or issue a disposition on the motion based on the

---

R. Nash, Trustees of M/B Douglas E. Nash; Allen F. Gould and Daniel R. Nash, Trustees of M/B Enid A. Nash; Allen Floyd Gould; Ann Houlder Kellam; Anne W. Klepfer; Anne W. Klepfer, Custodian for Jennifer A.; Anne W. Klepfer, Custodian for Michael K.; Barbara Wynne Shapiro; Barbara Wynne Shapiro, Custodian for Christopher Scott Shapiro; Barbara Wynne Shapiro, Custodian for Matthew Zachary Shapiro; Laurel Q. Murphy, Custodian for Molly Jean; Daniel R. Nash, Custodian for Mark N. Delinski; Daniel R. Nash; Douglas E. Nash II; Daniel R. Nash, Trustee for Benjamin C. Nash Trust; Daniel R. Nash, Trustee for Jason Myers Nash; Daniel R. Nash, Trustee for Michael James Nash; Eileen Helwig Bly; Elizabeth Kellam Williams; Enid Louise N. Gould Family Trust; Enid-Louise N. Gould Revocable Trust; Georgia A. Nash; Heather A. Corn; Hilary S. Lloyd; Hilary S. Lloyd, Custodian for Ian D. Lloyd; Hilary S. Lloyd, Custodian for James P. Lloyd; Holly J. Desimone; Janet N. Sametz Generation Skipping Trust; Jo D. Williams; John A. Bly, John Lemoine; Julia E. Friend; Julia Gould Guastucci; Laurel Q. Murphy; Laurel Q. Murphy, Custodian for Colin Graham; Laurel Q. Murphy, Custodian for Molly Jean; Liva & Co., EQ F/B/O Peter Quintard; Lizabeth E. Bly, Custodian for Maxwell Bly Lemoine; Lizabeth E. Bly, Custodian for Michael Bly Lemoine; Marion K. Friend; Mark H. Nordenson; Mark H. Nordenson, Custodian for Christopher J. Nordenson; Mark N. Nordenson, Custodian for Emily N. Tofil; Mark H. Nordenson, Custodian for James S. Tofil; Mark H. Nordenson, Custodian for John J. Tofil IV; Mark H. Nordenson, Custodian for Lara Kerstin Nordenson; Moira Simonds, Custodian for Christopher J. Nordenson; Moira Simonds, Custodian for Lara K. Nordenson; Nash L. Bly; Nash L. Bly, Custodian for Graham Nash Bly; Peter Quintard; J. Robert Shapiro, Ryder Quintard; Sarah Alice Jeannie Quintard; Shannon Q. Tosatti; Starr N. Tofil, Custodian for Emily N. Tofil; Starr N. Tofil, Custodian for James S. Tofil; Starr N. Tofil, Custodian for John J. Tofil IV; Starr N. Tofil; Tacey B. Dietlmeier; Terry Frances Dietlmeier; The Benjamin C. Nash Trust; The Lewis H. Nash Foundation; Timothy J. Nash; Wendy Lee Kellam; William B. Nash; Wynne R. Sharpiro, Trustee for Christopher S. Shapiro; and Wynne R. Shapiro, Trustee for Matthew Z. Shapiro.  See Defendants' Motion to Dismiss (Doc. No. 17).

allegations in the amended pleading.  See id. at 303-04.  Here, because the only relevant difference between the Complaint and Amended Complaint is the addition of named defendants, compare Compl. at 1-3 with Am. Compl. at 1-8, the court will consider the Motion as brought against the Amended Complaint.  However, unless stated otherwise, the court limits its Ruling to the claims against the defendants who filed the instant Motion.  For ease of reference, the court will refer to Nash Holdings and the subset of former Nash Engineering shareholders who filed the Motion to Dismiss, collectively, as the defendants.

      A.    <u>Factual Background</u>

This action was commenced by Mr. Roumeliotis, the Trustee of Nash Engineering's bankruptcy estate.  See Am. Compl.  The court provides a summary of allegations relevant to this Ruling with reference to the Trustee's Amended Complaint as well as other background information.  As the court must, it construes all well-pled allegations as true for the purpose of deciding the defendants' Motion to Dismiss.

The Nash Engineering Company was founded in 1905 by Lewis Nash.  Am. Compl. ¶ 10.  "[I]ts business primarily consisted of manufacturing liquid ring vacuum pumps used in various industries for vacuum steam heating systems, vacuum sewage collection systems, and to manufacture pulp and papers".  Id.  From 1905 until 2002, Lewis Nash and other members of the Nash family were involved in the ownership, management, or both of the business.  Id. ¶ 11.  In approximately July 2004, Nash Holdings became the sole owner of Nash Engineering.  Id. ¶ 28.  On October 19, 2021, Nash Engineering filed a voluntary petition under Chapter 7 of the Bankruptcy Code.  Id. ¶ 8.  The following day, on October 20, 2021, Mr. Roumeliotis was appointed Chapter 7 Trustee of Nash Engineering's bankruptcy estate.  Id. ¶ 9.

From at least 1991 until October 19, 2021, Nash Engineering was a named defendant in thousands of lawsuits brought by claimants alleging injuries or death from exposure to asbestos in its products.  Id. ¶ 12.  Nash Engineering filed a Statement of Financial Affairs on November 2, 2021, in which it reported that it was a party to over 1,600 then-pending asbestos lawsuits.  Id. ¶ 13.

From approximately 2002 to 2009, Nash entered into a series of transactions through which it sold substantially all of its assets and transferred the proceeds to Nash Holdings.[2]  Id. ¶¶ 14, 34-36.  In March 2002, Nash Engineering and Audax Private Equity Fund, L.P. ("Audax") entered into a series of transactions to combine Nash's business with that of elmo vacuum technology GmbH, a subsidiary of Siemens AG.  Id. ¶ 17.  Nash Engineering and Audax owned approximately 35.75 and 64.25 percent, respectively, of the combined business, which operated under the name, "Nash Elmo." Id. ¶¶ 18-19.  Nash Engineering was to remain solely responsible for the asbestos-related lawsuits stemming from its manufacturing.  Id. ¶ 20.

On or about July 28, 2004, pursuant to a Merger Agreement between Nash Elmo and Gardner Denver, Inc. ("Gardner Denver"), Nash Elmo was merged into Gardner Denver, and Gardner Denver acquired the entirety of Nash Engineering's 35% ownership interest in Nash Elmo.  Id. ¶¶ 21, 31.  Nash Engineering received over $59.7 million in gross sales proceeds from the sale of its interest.  Id. ¶ 31.  Upon the Trustee's information and belief, the net proceeds equaled over $44.6 million.  Id.

---

[2] According to the Amended Complaint, Nash Engineering transferred approximately $59,720,000 in total to Nash Holdings.  See Am. Compl. ¶ 37.  Nash Engineering transferred approximately $2,134,000 in 2004; $24,692,000 in 2005; $9,960,000 in 2006; $4,980,000 in 2007; $7,272,000 in 2008, $9,470,000 in 2009, $1,019,000 in 2010, and $166,000 in 2011.  See id.

Following the merger, Nash Engineering's assets consisted of cash, insurance policies, and real estate it leased to Gardner Denver.  Id. ¶¶ 22, 33.

Further, in connection with the merger, Nash Engineering internally reorganized and formed Nash Holdings.  Id. ¶ 24.  Some or all of Nash Engineering's officers and directors simultaneously served as managers of Nash Holdings from the date that Nash Holdings was formed until Nash Engineering's bankruptcy filing.  Id. ¶ 25.  "By serving in those dual roles, Nash Holdings' managers controlled all of [Nash Engineering]'s decisions."  Id.  Each share of Nash Engineering's common and preferred stock was cancelled.  Id. ¶ 27.  All previous holders of such stock "received an equivalent number of membership units of Nash Holdings with identical rights and restrictions as their prior stock interests in [Nash Engineering]."  Id.  Over 100 members of the extended Nash family who owned, in their own names or through a trust, various classes of shares in Nash became members of Nash Holdings.  Id. ¶ 26.  Subsequently, as of approximately July 2004, Nash Holdings became the sole owner of Nash Engineering.  Id. ¶ 28.  Thus, Nash Holdings elected all of Nash Engineering's directors and had the right to approve Nash Engineering's actions; however, it "went beyond its role as sole shareholder and exercised control over all of [Nash Engineeirng]'s assets and affairs", including but not limited to: "disposition of [ ] assets, the distribution of [ ] cash to Nash Holdings, payment of [ ] employee salaries, the payment of [ ] ongoing expenses, maintaining [ ] relations with its product-liability insurers and defense counsel, directing negotiations with insurers to settle TNEC's insurance policies to benefit Nash Holdings' interests, orchestrating [the] dissolution in April 2020, and initiating [the] voluntary bankruptcy filing in October 2021.  Nash Holdings caused [Nash Engineering] to have no cash

except for [a]sset [p]roceeds, and [caused] those [a]sset [p]roceeds to be distributed to [Nash Holding] rather than kept as an asset of [Nash Engineering] to meet its ongoing obligations." Id. ¶¶ 29-30.

Nash Engineering sold its remaining real estate and liquidated its life insurance policies between approximately 2006 and 2009 and transferred the resulting proceeds to Nash Holdings. Id. ¶¶ 34, 36. By 2011, Nash Engineering had distributed all of its assets—with the exception of certain insurance policies—to Nash Holdings and was left with no cash. Id. ¶¶ 14, 23, 36, 38. The transfers "were not publicly disclosed or readily subject to discovery through reasonable due diligence before [Nash Engineering] filed its [b]ankruptcy [p]etition." Id. ¶ 51. Nash Holdings further distributed the transfers to its members. Id. ¶ 39. Following the transfers, Nash Engineering did not conduct any business but remained in existence until it filed its bankruptcy petition in order to process and pay asbestos-related claims until its insurance policies were depleted. Id. ¶¶ 23, 45.

Nash Engineering "crafted a scheme to strip the proceeds . . . from being reached by asbestos claimants and thereby to enrich the [Nash Holdings members], consisting of the extended Nash family and their affiliates." Id. ¶ 16. Nash Engineering "was insolvent" at the time of or was "rendered insolvent as a result of the" transfers. Id. ¶ 42. At the time of the transfers, Nash Engineering knew or should have known that it would be subject to further liability from asbestos-related lawsuits and that such liabilities far exceeded its assets, including insurance coverage. Id. ¶¶ 15, 41, 47, 78. Nash Engineering knew that, because asbestos disease is not diagnosed until years after exposure to asbestos, potential claims would not arise until years after the

transfers had been made.  Id. ¶ 54.  Thus, potential claimants would or could not investigate any of Nash Engineering's transfers until after being diagnosed.  Id. ¶ 55. Further, by remaining in existence to process asbestos claims, Nash Engineering "avoided creat[ing] circumstances where creditors would investigate . . . and potentially discover" the transfers.  Id. ¶ 52.

"The interests of [Nash Engineering] and its creditors thus required retention of all or whatever portion of sale proceeds would be necessary to pay asbestos claims and to maximize the value of [Nash engineering]'s insurance by vigorously enforcing [Nash Eingineering]'s rights against insurers."  Id. ¶ 48.  To prevent creditors from reaching its assets, Nash Engineering transferred its proceeds to Nash Holdings.  Id. ¶ 43.  From 2011 until October 19, 2021, the date on which it filed its bankruptcy petition, Nash Engineering held no cash in its own name.  Id. ¶ 44.  Thus, "[i]nstead of preserving the proceeds . . . to satisfy asbestos personal injury and wrongful death claims, [Nash Engineering] pursued a scheme to distribute all of its cash to Nash Holdings, knowing that the funds would be further distributed to [the members] and that victims of asbestos disease from exposure to [Nash Engineering]'s products would go unpaid."  Id. ¶ 49

There exists at least one creditor, Lisa Redwine ("Redwine"), with asbestos-related claims against Nash Engineering.  Id. ¶ 56.  Redwine was exposed to asbestos from Nash's products prior to the execution of the transfers but did not discover the transfers until she was diagnosed with asbestos disease within the year preceding the date Nash Engineering filed for bankruptcy.  Id.

    B.    <u>Procedural Background</u>

The Trustee filed the Complaint against the defendants in the United States Bankruptcy Court on October 18, 2023.  See Compl., No. 23-05022 (Doc. No. 1).  The

defendants moved to dismiss on January 5, 2024.  See Mot., No. 23-05022 (Doc. No. 18).  The Trustee filed an Amended Complaint shortly thereafter on January 16, 2024, see Am. Compl., No. 23-05022 (Doc. No. 17), and his Opposition Memorandum to the Motion to Dismiss on February 20, 2024, see Opp., No. 23-05022 (Doc. No. 25).  The defendants filed their Reply on May 5, 2024.  See Reply, No. 23-05022 (Doc. No. 28).

On March 6, 2024, the parties jointly moved to withdraw the reference to the U.S. District Court.  See Motion for Withdrawal of Reference, No. 23-035022 (Doc. No. 29). On April 28, 2024, the court granted the withdrawal.  See Order, No. 23-035022 (Doc. No. 42).

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6)

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor.  See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020) (citing Palin v. New York Times Co., 940 F.3d 804, 809 (2d Cir. 2019)).  However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678.

B.    Rule 9(b)

Rule 9(b) requires that, in alleging fraud, a party must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A complaint alleging fraud must ordinarily: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  Olson v. Major League Baseball, 29 F.4th 59, 71 (2d Cir. 2022) (quoting Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).  However, "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific."  United States ex rel. Chorches for Bankruptcy Estate of Fabula v. Am. Med. Resp., Inc., 865 F.3d 71, 81 (2d Cir. 2017) (internal quotations and citations omitted).  "Despite the generally rigid requirement [of Rule 9(b)], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  Id. at 81-82 (internal quotations and citations omitted).  "Pleading on information and belief" is therefore "a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."  Id. at 82 (internal quotations and citations omitted).  When pleading on information and belief, a complaint must "adduce specific facts supporting a strong inference of fraud."  Id. (internal quotation marks and citations omitted).

Rule 9(b) also provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. Pro. 9(b).  "The [S]econd [C]ircuit has recognized that the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity . . . for the simple reason that a plaintiff realistically

cannot be expected to plead a defendant's actual state of mind." Conn. Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP, 128 F. Supp. 3d 501, 507-08 (D. Conn. 2015) (internal quotations and citations omitted).

## IV. DISCUSSION

In the Amended Complaint, the Trustee asserts four counts (Counts I-IV) against Nash Holdings and one count (Count V) against the shareholders. The Trustee asserts an actual fraudulent conveyance claim under Connecticut Uniform Transfer Act ("CUFTA") pursuant to section 544 and 550 Bankruptcy Code in Count I, see Am. Compl. ¶¶ 58-66, and under the Bankruptcy Code in Count II, see id. ¶¶ 67-72. Count III alleges constructive fraudulent transfer under the Bankruptcy Code. See id. ¶¶ 73-81. Count IV consists of an unjust enrichment claim. See id. ¶¶ 82-84. In Count V, the Trustee seeks recovery of Nash Holdings' subsequent transfers to its members pursuant to the Bankruptcy Code and CUFTA. See id. ¶¶ 85-88.

The defendants move to dismiss on several grounds. First, the defendants seek dismissal of the state law claims in Counts I and V for lack of standing. See Mem. at 10-13. Second, the defendants argue that the claims in all five counts are untimely. See id. at 13-17. Third, they argue that the Trustee fails to state a claim in all five counts and that Counts I and V fail to meet level of specificity required by Rule 9(b). See id. at 17-25. Lastly, the defendants contend that the complaint should be dismissed with prejudice. See id. at 25-26.

### A. CUFTA Standing (Counts I & V)

In Count I, the Trustee alleges actual fraudulent transfer under section 52-552e(a)(1) of CUFTA and sections 544 and 550 of the Bankruptcy Code. See Am. Compl. ¶¶ 58-66. In Count V, the Trustee seeks recovery of transfers to subsequent

transferees under both sets of laws.  See id. ¶¶ 85-88.  The defendants move to dismiss the CUFTA claims in Counts I and V on the ground that the Trustee does not have standing under the statute.  See Mem. at 10-13.

Before turning to the merits, the court notes that Rule 12(b)(6) applies to this issue.  Motions to dismiss for lack of standing are normally subject to Rule 12(b)(1).  However, whether the plaintiff is authorized to sue under a particular statute, otherwise known as statutory standing, "relates to the merits" and does not implicate the court's constitutional or statutory power to adjudicate the case.  See Do No Harm v. Pfizer, Inc., 96 F.4th 106, 112 n.4 (2d Cir. 2024) (citing Am. Psychiatric Assoc. v. Anthem Health, 821 F.3d 352, 359 (2d Cir. 2016));  Evolution Fast Food One, LP v. HVFG, LLC, — F. Supp. 3d —, 2024 WL 1054362, at *4 (S.D.N.Y. 2024);  see also Lexmark Int'l, Inc. v. Status Control Components, Inc., 572 U.S. 118, 126-27 (2014) (clarifying that prudential standing is a misnomer as applied to statutory standing or the zone-of-interest analysis, both of which require statutory interpretation).

For purposes of CUFTA standing, a trustee stands in shoes of a creditor.  See In re Anderson, 651 B.R. 82, 92 (Bankr. D. Conn. 2023) (internal quotation marks and citation omitted) ("CUFTA provides that transfer avoidance is available to a trustee if she has the status and rights of a creditor whose claim arose before the transaction was made.");  see also 11 U.S.C. § 544.  Under CUFTA, "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if [inter alia] the creditor's claim arose before the transfer was made or the obligation was incurred . . . ."  Conn. Gen. Stat. § 52-552e.  In turn, "to have standing to bring a claim under CUFTA, a claimant must have been a creditor at the time the alleged fraudulent transfer took place."  Carney v.

Lopez, 933 F. Supp. 2d 365, 378 (D. Conn. 2013) (citing Chien v. Skystar Bio Pharm.

Co., 623 F. Supp. 2d 255, 267 (D. Conn. 2009)); see also FloodBreak, LLC v. Diego Tr.,

LLC, No. 3:22-CV-840 (SRU), 2024 WL 896604, at *8 (D. Conn. Mar. 1, 2024) (slip

copy).

The defendants argue that Redwine—the only alleged creditor identified in the

Amended Complaint—did not become a creditor until after the last transfer took place in

2011 because her asbestos claim did not become actionable until 2021, when her injury

was discovered.  See Mem. at 10-13.  The Trustee counters that a "claim" for purposes

of CUFTA standing need not be actionable prior to the transfers.  See Opp. at 6-8.

> Under CUFTA:
>
> A "creditor" is a "person who has a claim," and a "debtor" is "a person who
> is liable on a claim."  A "'[c]laim' means a right to payment, <u>whether or not
> the right is reduced to judgment, liquidated, unliquidated, fixed, contingent,
> matured, unmatured, disputed, undisputed, legal, equitable, secured, or
> unsecured.</u>"

FloodBreak, LLC v. Diego Tr., LLC, No. 3:22-CV-840 (SRU), 2024 WL 896604, at *8 (D.

Conn. Mar. 1, 2024) (slip copy) (emphasis added) (quoting Conn. Gen. Stat. § 52-

552b(3), (4), (6)).

> The legislature chose to adopt a very broad definition of the term claim.
> [U]nresolved civil claims (and even civil causes of action that have not yet
> been brought) are sufficient to confer creditor status[.]  Temporally, a
> plaintiff's claim arises on the date of the injury in the underlying action, not
> upon the commencement of legal action or entry of judgment.

Id. (internal quotation marks and citations omitted) (alterations in original); see also

Canty v. Otto, 304 Conn. 546, 561 (2012).  Thus, Redwine became a "creditor" for the

purposes of CUFTA on the date(s) of injury, 1982-1985, substantially before the alleged

2004-2011 transfers.  See, e.g., Canty, 304 Conn. at 561 (holding that, for purposes of

CUFTA standing, the administratrix's "claim" arose on the date the deceased was

murdered by defendant's spouse rather than on the date the estate commenced a wrongful death action or the date the spouse was criminally charged); FloodBreak, 2024 WL 896604, at *8 (holding defendants "became alleged debtors under CUFTA when they started facing potential liability").

In their Reply, the defendants note that, in Lippe v. Bairnco Corporation, the Second Circuit, interpreting New York's fraudulent transfer act, held that "the hypothetical existence of an unaccrued tort claim does not give rise to a debtor-creditor relationship" because a toxic-tort cause of action does not accrue until the date of discovery of the injury. See Reply at 2 (quoting Lippe v. Bairnco Corp., 99 F. App'x 274, 282 (2d Cir. 2004)). However, Lippe is inapposite. The defendants fail to appreciate that the Lippe court's discussion was explicitly for the "purposes of a solvency analysis" under section 271(1) of New York Debtor and Creditor Law, which, at the time, "refer[red] to 'existing debts' as the relevant starting point." See Lippe, 99 F. App'x at 282. Even if, assuming, arguendo, Lippe stood for the proposition that a state's insolvency definition controls or otherwise impacts a creditor's standing to assert state law claims for fraudulent conveyance, it would not produce a different outcome in the instant case. While, at the time Lippe was decided, New York limited its insolvency analysis to "existing debts", CUFTA does not have a similar limitation. Compare N.Y. Debt. & Cred. Law § 271(1) (2004) ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.") with Conn. Gen.

Stat. § 52-552c(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). [3]

Prior to 2020, New York defined "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  See N.Y. Debt. & Cred. Law § 270 (2019).  Caselaw interpreting this definition provides that, "[u]nder New York's broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor, and that relationship arises the moment the cause of action accrues."  See, e.g., DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A., 413 F. Supp. 3d 187, 223 (S.D.N.Y. 2019) (quoting Drenis v. Haligiannis, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006)).  The definition of "creditor" under current New York and Connecticut laws are nearly identical.  Compare N.Y. Debt. & Cred. Law § 270(c)-(d) (2024) with Conn. Gen. Stat. § 52-552b(3)-(4).  Like CUFTA, see, supra, at 12, New York now defines "creditor" as "a person that has a claim", see N.Y. Debt. & Cred. Law § 270(d) and "claim" as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured", see id. § 270(c).

This court is not aware of caselaw that has reexamined creditor standing under New York's Uniform Voidable Transactions Act ("NY-UVTA") following the change in definition.  However, assuming, arguendo, courts in New York were to maintain that, even with the statutory changes, a "claim" for the purposes of standing under NY-UVTA does not arise until the underlying action accrues, any persuasive effect such authority

_____

[3] Since Lippe was decided, section 271 of the New York Debtor and Creditor Laws has been amended, now providing that "[a] debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets."  See N.Y. Debt. & Cred. Law § 271(a) (2024).

would have is precluded here given the Connecticut Supreme Court's decision in <u>Canty v. Otto</u>, 304 Conn. at 561, which held that a claim under section 52-552b of CUFTA arises on the date of injury.  <u>See</u>, <u>supra</u>, at 12.

In sum, neither <u>Lippe</u> nor New York's Uniform Voidable Transactions Act has any bearing in this case on the Trustee's CUFTA claims.  As such, the court denies the defendants' Motion to Dismiss the Trustee's CUFTA claims in Counts I and II for lack of standing.

B.    <u>Timeliness</u>

The defendants move to dismiss the CUFTA claims in Counts I and V and the claims in Counts II, III, and IV on the ground that they are time-barred by the applicable statutes of limitations or repose.  <u>See</u> Mem. at 10-17.

1.    CUFTA Claims (Counts I & V)

CUFTA provides that:

> [a] cause of action with respect to a fraudulent transfer or obligation under sections 52-552a to 52-552l, inclusive, is extinguished unless action is brought . . . under subdivision (1) of subsection (a) of section 52-552e, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant . . . .

Conn. Gen. Stat. § 52-552j.  Section 108 of the Bankruptcy Code extends statutes of limitations under non-bankruptcy law to permit a trustee to bring a cause of action that was extant as of the date of the bankruptcy petition within the time outlined in section 546(a).  <u>See</u> 11 U.S.C. § 108(a); <u>see also</u> <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011) (collecting cases).  Section 546 provides, in relevant part, that actions for avoiding transfers must be commenced within two years of the filing of the bankruptcy petition.  <u>See</u> 11 U.S.C. § 546(a); <u>see also</u> 11 U.S.C. §

301(b) ("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.").

In the instant case, because the Complaint was filed before the expiration of two years following Nash Engineering bankruptcy filing, the Trustee complied with the time period in section 546(a).  Thus, the relevant period for measuring the CUFTA limitations period is from the purported transfer dates to October 19, 2021, the date of the bankruptcy petition.  See, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 445 B.R. at 231 ("Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the complaint, it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made six years before the petition date.").

It is uncontroverted that the Trustee's CUFTA claims do not meet the four-year period in section 52-552j because Nash Engineering filed its bankruptcy petition approximately ten years after the last of the alleged transfers.  The parties' dispute instead focuses on whether the claims were timely under the one year "discovery" clause of section 52-552j.  See Mem. at 15-16; Opp. at 9-15.  The defendants argue that the one-year discovery clause is a statute of repose and further, in that vein, the Trustee's conclusory allegation "that the alleged transfers could not be discovered by creditors until the Petition Date" is insufficient given the "plethora of publicly available

information documenting the sale of substantially all of Nash's assets."[4]  See Mem. at

15-17; Reply at 5-6.  In contrast, the Trustee implicitly assumes section 52-552j is a

statute of limitations and consequently, that the burden lies with the defendant.  See

Opp. at 9-15.

     This court is not aware of any decision that has explicitly addressed the issue of

whether section 52-552j is a statute of limitations or repose.[5]  However, in State v.

Lombardo Bros. Mason Contractors, the Connecticut Supreme Court discussed statutes

of limitations and repose at length.  See 307 Conn. 412, 443-44 (2012).  The Court first

noted that it "has [never] recognized a substantive distinction between statutes of

limitation and statutes of repose."  See id. at 443.  It further explained that:

> . . . [w]hether seen as a sanction imposed on plaintiffs who sleep on their
> rights or as a benefit conferred [on] defendants to reduce the risk and
> uncertainty of liability, statutes of limitation and statutes of repose serve
> the same public policy of avoiding the litigation of stale claims.  Thus, in
> this state, the characterization of a statute of repose as procedural or as
> substantive is governed by the same test that applies to statutes of
> limitation.  Under that test, statutes of repose, like statutes of limitation,
> are neither substantive nor procedural per se . . . .  In any given case, the
> characterization of the applicable statute of repose depends on the nature
> of the underlying right that forms the basis of the lawsuit.  If the right
> existed at common law, then the statute of repose is properly
> characterized as procedural because it functions only as a qualification on
> the remedy to enforce the preexisting right.  If, however, the right is newly

---

[4] The defendants specifically assert that the transfers were discoverable from: (1) the documents underlying the transactions that were filed with the Secretary of State in 2004, (2) the Certificates of Dissolution filed in 2009 and 2020, (3) public information regarding the merger and acquisition, or (4) the Certificate of Amendment filed in 2004.  See id. at 16-17; see also id. at 16 n. 8 (citing news articles concerning the Gardner Denver acquisition); Defs.' Ex. B, Certificate of Dissolution (Apr. 20, 2020), Certificate of Dissolution (Dec. 31, 2008), Certificate of Amendment (Aug. 30, 2004), & Certificate of Merger (Aug. 30, 2004) (Doc. No. 17); Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004) (Doc. No. 17).

[5] While the court in Epperson v. Entertainment Express, Inc. and Carney v. Lopez characterized section 52-552j differently, neither decision offered any analysis for the respective characterizations. Compare Epperson v. Ent. Express, Inc., 338 F. Supp. 2d 328, 343 (D. Conn. 2004), aff'd sub nom. Epperson v. Ent. Exp., Inc., 159 F. App'x 249 (2d Cir. 2005) (referring to section 52-552j as a statute of repose) with Carney v. Lopez, 933 F. Supp. 2d 365, 386 (D. Conn. 2013) (referring to section 52-552j as a statute of limitations).

> created by the statute, then the statute of repose is properly characterized as substantive because the period of repose is so integral a part of the cause of action as to warrant saying that it qualifie[s] the right.  [When] . . . a specific time limitation is contained within a statute that creates a right of action that did not exist at common law, then the remedy exists only during the prescribed period and not thereafter . . . . In such cases, the time limitation is not to be treated as an ordinary statute of limitation . . . but rather is a limitation on the liability itself, and not of the remedy alone . . . . [U]nder such circumstances, the time limitation is a substantive and jurisdictional prerequisite, which may be raised [by the court] at any time . . . and may not be waived.

Lombardo Bros., 307 Conn. at 443-44 (internal quotation marks and citations omitted) (alterations in original).  Thus, under Connecticut law, it matters not whether section 52-552j is labeled a statute of limitation or of repose; instead, the critical inquiry is whether section 52-552j is "substantive" or "procedural".

At first glance, section 52-552j is seemingly substantive because, as part of the CUFTA statute, it contains a limitations period for CUFTA claims, i.e., statutory causes of action.  However, CUFTA is not the sole basis for a cause of action for fraudulent conveyance.  See Carney v. Lopez, 933 F. Supp. 2d at 377 (citing Certain Underwriters at Lloyd's, London v. Cooperman, 289 Conn. 383, 395 (2008)).  Indeed, CUFTA "is 'largely an adoption and clarification of the standards of the common law of [fraudulent conveyances]' . . . ." Id. (quoting Certain Underwriters, 289 Conn. at 395).  "[A]lthough the statute provides for a broader range of remedies", a claim for fraudulent conveyance under either CUFTA or the common law requires proof of the same elements.  See Certain Underwriters, 289 Conn. at 395.  As such, it is no surprise that they are often considered in tandem.  See e.g., id.; Carney v. Lopez, 933 F. Supp. at 378.  Because recovery for fraudulent conveyance is not a right newly created by statute, the limitations period is not "so integral a part of the cause of action as to warrant saying that it qualifie[s] the right."  See Lombardo Bros., 307 Conn. at 444; see also Moore v.

McNamara, 201 Conn. 16, 25 (1986) (holding that, although substantive and jurisdictional at one point, the statute of limitations for paternity actions is procedural because the paternity statute "no longer is the sole basis for a paternity action" after the Supreme Court derivatively based a father's obligation to support children born out of wedlock on the common law).  Therefore, section 52-552j is procedural and operates similarly to a federal statute of limitations in that it is an affirmative defense subject to waiver.  Lombardo Bros., 307 Conn. at 444 ("[when] a statute of [repose] is procedural, it is subject to waiver; unless specifically pleaded it is deemed waived and the remedy continues beyond the prescribed period" (quoting Moore, 201 Conn. at 22)).

In the Amended Complaint, the Trustee alleges that the transfers were not publicly disclosed or reasonably discoverable by asbestos claimants before the Petition Date, i.e., October 19, 2021.  See Am. Compl. ¶¶ 51, 53.  He also alleged that, by remaining in existence to process asbestos liability claims, Nash Engineering "avoided creat[ing] circumstances where creditors could investigate fraudulent transfers and potentially discover" the transfers.  See id. ¶ 52.  Further, he pled that Nash Engineering knew that: (1) individuals would not be aware of their claims against Nash Engineering because asbestos disease cannot be diagnosed until years following their exposure; and (2) those unaware of their claims would not and could not investigate the transfers.  See id. ¶¶ 54-55.  The Amended Complaint also contained an allegation that asbestos claimants like Redwine, who were diagnosed with asbestos disease in the one-year period prior to the October 19, 2021—the date of Nash Engineering's Chapter 7 bankruptcy petition—did not discover the transfers until after their diagnosis.  See id. ¶ 56.  Further, in her Declaration, filed as an exhibit to the Complaint and Amended

Complaint, Redwine states that she was diagnosed with mesothelioma in June 2021. Based on these allegations, at least one creditor could not reasonably discover the transfers until at least June 2021, i.e., four months prior to the bankruptcy petition. Thus, the defendants have not established their defense based on the face of the Amended Complaint.

The defendants offer several exhibits that they purport publicly disclose the transfers from Nash Engineering to Nash Holdings.  See Defs.' Ex. B, Certificate of Dissolution (Apr. 20, 2020), Certificate of Dissolution (Dec. 31, 2008), Certificate of Amendment (Aug. 30, 2004), & Certificate of Merger (Aug. 30, 2004) (Doc. No. 17); Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004) (Doc. No. 17).  A motion to dismiss under Rule 12(b)(6) must be decided by the face of the complaint and not outside documents.  See Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").  However, a court may take judicial notice of public information or filings to determine if the plaintiff was on inquiry notice.  See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." (citations omitted)).

At most, the publicly filed documents offered by the defendants concerning the Gardner Denver merger provided notice that Nash Engineering could dissolve once its insurance proceeds were exhausted.  See Defs.' Ex. B, Certificate of Dissolution (Apr. 20, 2020), Certificate of Dissolution (Dec. 31, 2008), Certificate of Amendment (Aug. 30, 2004), & Certificate of Merger (Aug. 30, 2004); Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004).  However, none of these documents mention the subsequent transfers of the proceeds to Nash Holdings.  Insofar as the defendants contend that a reasonable person would know, after reviewing these public documents, that Nash Engineering held no cash or would soon hold no cash assets and thus be on notice of the transfers, the court sees no basis to draw such an inference.

As the court wrote in its Ruling on the Motion to Dismiss in the related case, No. 23-CV-1366 (JCH):

> At most, the excerpt of the Agreement and Plan Merger provided to the court discloses the sale of Nash Engineering's ownership interest in Nash Elmo, see, e.g., Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004)[6]; and the 2004 Certificate of Amendment provides that Nash Engineering had the option to dissolve as early as 2009, provided its insurance policies were exhausted.[7]  See Defs.' Ex. B, Certificate of

---

[6] The court notes that the excerpt of the Agreement and Plan Merger in defendants' Exhibit C is only comprised of a five-page table of contents and the introduction.  See Defs.' Ex. C, Agreement and Plan Merger (July 28, 2004).

[7] The Certificate of Amendment amended Nash Engineering's Certificate of Incorporation by adding an article that provided, in relevant part:

> [U]ntil the later to occur of: (a) December 31, 2008; or (b) the date on which all Insurance Policies . . . have been exhausted and are no longer in effect and thirty days have expired from the date the Corporation provides notice to Gardner Denver, Inc. of its intention to do any of the acts described in (i)-(iv) below, . . . the Corporation shall not do any of the following: (i) dissolve, (ii) consolidate or merge with or into any other entity where the Corporation is not the surviving entity or where such surviving entity does not continue to be bound by the provisions provided for in this Article [ ]; (iii) transfer or distribute any of the Insurance Policies to any other entity; or (iv) repeal, amend or otherwise modify any provision pertaining to this Article [ ] without the consent of Gardner Denver, Inc., which may be withheld in its sole discretion.

See Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).

21

Amendment (Aug. 30, 2004).  However, a word search of relevant key terms reveals that none of these documents mention Nash Holdings, let alone anything related to the transfers at issue here.  To the extent the defendants implicitly argue that a reasonable person would understand that Nash Engineering would soon hold no assets of its own after reviewing these documents, the court disagrees.  Nash Engineering remained in existence for a decade or more following: (1) the first date upon which it could have feasibly dissolved (January 30, 2009), and (2) the 2004-2011 transfers.  Thus, whatever notice the Certificate of Amendment provided regarding a <u>potential</u> dissolution of Nash Engineering and any accompanying foreseeable depletion of its assets, it did not apprise non-insiders of when Nash Engineering could or would dissolve.  <u>See</u> Defs.' Ex. B, Certificate of Amendment (Aug. 30, 2004).  Nor does the possibility of a future dissolution signify Nash Engineering would be insolvent in the years the transfers took place, 2004 to 2011.  As such, the court concludes there is no basis for the defendants' argument that the public documents presented to the court provided notice of Nash Engineering's plan to transfer proceeds from its sale of assets to Nash Holdings.

Ruling on Motion to Dismiss, No. 23-CV-1366 (Doc. No. 41) at 22-23.

Therefore, the court denies the defendants' Motion to Dismiss the CUFTA claims in Counts I and V on the ground that they are barred by the limitations period in section 52-552j of CUFTA.

### 2.    Bankruptcy Fraudulent Transfer Claims (Counts II & III)

In Counts II and III, the Trustee asserts claims of actual and constructive fraudulent transfers, respectively, under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.  <u>See</u> Am. Compl. ¶¶ 67-81.

Section 548(a)(1)(A) authorizes a trustee to claw back "any transfer of an interest of the debtor in property" made "with actual intent to hinder, delay, or defraud" creditors.  Section 548(a)(1)(B) authorizes a trustee to recover transfers if the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer and the debtor received less than "a reasonably equivalent value in exchange for such transfer."  These authorizations apply to transfers made within the two years prior to the date on which the bankruptcy petition was filed.

In re Bernard L. Madoff Inv. Sec. LLC, 976 F.3d 184, 190 (2d Cir. 2020) (hereinafter "In re BLMIS") (quoting 11 U.S.C. § 548(a)(1)).  Section 550 allows a trustee to recover transfers avoided under, inter alia, section 548 from the initial transferee or any subsequent "immediate or mediate" transferee.  See 11 U.S.C. § 550.

The defendants argue that the fraudulent transfer claims under subparts (A) and (B) of section 548(a)(1) in Counts II and III are time-barred under the statutory two-year requirement.  See Mem. at 13-14.  In his Opposition, the Trustee argues that the temporal requirement contained in section 548 is a statute of limitations subject to equitable tolling.  See Opp. at 15-18.

As the defendants correctly argue, see Mem. at 13-14, section 548's temporal requirement is a statutory element, not a statute of limitations.  See In re Stanwich Fin. Servs. Corp., 488 B.R. 829, 835 (D. Conn. 2013); Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 603 B.R. 682, 687 (Bankr. S.D.N.Y. 2019) (listing the two-year period as an element of claim under section 548(a)(1)(A)); accord In re BLMS, 976 F.3d at 201-02 (discussing the two-year period as a limitation on the subset of transfers that can be avoided rather than as a limitation on the trustee's claim under section 548(a)(1)); In re BLM, 773 F.3d 411, 416 (2d Cir. 2014) ("Importantly, a trustee can invoke [subsections (A) and (B) of section 548(a)(1)] to recover payments only if the payments were 'made . . . within 2 years before the date of the filing of the petition.'" (quoting 11 U.S.C. § 548(a)(1))).  Thus, contrary to the Trustee's contention, see Opp. at 15-18, the two-year period in section 548 is not subject to equitable tolling.[8]  See In re Stanwich Fin. Servs. Corp., 488 B.R. at 835.  Because the transfers were made

---

[8] Section 546(a) provides the relevant statute of limitations for claims under section 548.  See 11 U.S.C. § 546(a).

between 2004 and 2011, see Am. Compl. ¶¶ 34, 37-38, 44, and the Complaint was filed on October 18, 2023, the court grants the defendants' Motion to Dismiss the claims under section 548(a)(1) in Counts II and III.

### 3.    Unjust Enrichment Claim (Count IV)

The defendants move to dismiss the Trustee's unjust enrichment claim in Count IV, arguing that it is governed by the three-year limitations period applicable to tort claims in Connecticut.  See Mem. at 14.  The Trustee counters that the timeliness of unjust enrichment claims in Connecticut is governed by laches, not a statute of limitations.  See Opp. at 18.

Connecticut previously "referred to unjust enrichment as both a tort and a quasi-contractual claim; however, [it] also ha[s] recognized, more accurately, that it is neither a species of tort nor contract but, rather, an equitable 'means of recovery in restitution.'" Reclaimant Corp. v. Deutsch, 332 Conn. 590, 599–600 (2019) (quoting Walpole Woodworkers, Inc. v. Manning, 307 Conn. 582, 587 n.9 (2012)) (collecting cases).  As such, the timeliness of unjust enrichment claims is governed by the equitable doctrine of laches.  See id. at 613.  The court may "look by analogy to [a] statute of limitations", but the limitations period contained therein is not binding.  See id. (first citing Dunham v. Dunham, 204 Conn. 303, 326-27 (1987), overruled on other grounds by Santopietro v. New Haven, 239 Conn. 207, 213 n.8 (1996); and then citing Certain Underwriters, 289 Conn. at 411)); Conn. Gen. Life Ins. Co. v. BioHealth Laboratories, Inc., 988 F.3d 127, 134-35 (2d Cir. 2021); see also Carney v. Lopez, 933 F. Supp. 2d at 386.

A defendant, seeking dismissal on laches, must prove inexcusable delay that resulted in prejudice to the defendant.  See Reclaimant Corp., 332 Conn. at 614 (citing Papcun v. Papcun, 181 Conn. 618, 620-21 (1980)).  A laches defense is ordinarily not

appropriate for resolution at the motion to dismiss stage, see Leopard Marine & Trading, Ltd. v. Easy Street Ltd., 896 F.3d 174, 193 (2d Cir. 2018), unless "available from the face of [the] complaint", see BioHealth Labs, 988 F.3d at 135.  Here, such a defense is "not available" from a reading of the Amended Complaint.  Thus, at this stage and absent a factual inquiry relating to the requisite elements, it would be inappropriate to decide whether the unjust enrichment is time-barred by the doctrine of laches.

Accordingly, the court denies the defendant's Motion to Dismiss the unjust enrichment claim in Count IV on timeliness grounds without prejudice to the defendants to assert an affirmative defense of laches.

C.     Sufficiency of the Allegations

1.     Fraudulent Transfer (Count I)

The defendants move to dismiss the actual and constructive fraudulent transfer claims in Counts I, II, and III for failure to state a claim.  See Mem. at 17-23.  Having dismissed the claims in Counts II and III on time grounds, the court need only address the defendants' arguments with respect to Count I.

The defendants contend that the Trustee failed to adequately allege intent with the specificity required by Rule 9(b).  See Mem. at 17-21.  They further emphasize that allegations made "upon information and belief" are insufficient under Rule 9(b).  See id. at 19-20.  The Trustee counterargues that he alleged at least three sets of circumstances that give rise to a strong inference of fraudulent intent.  See Opp. at 19-20 (citing Am. Compl. ¶¶ 14-16, 25-30, 35-55, 62, 69).  He also contends that allegations made "upon information and belief" are permissible when facts are within the opposing party's knowledge.  See id. at 20.

25

As discussed <u>supra</u>, <u>see</u> Section III.B., Rule 9(b) requires that plaintiffs alleging fraud "state with particularity the circumstances constituting fraud or mistake."  <u>See</u> Fed. R. Civ. P. 9(b).  However, the defendant's state of mind need only be alleged generally. <u>See</u> <u>id.</u>  "Conclusory allegations of [intent]" are sufficient if the alleged factual predicates give rise to a "strong inference of fraudulent intent."  <u>See</u> <u>Carney v. Lopez</u>, 933 F. Supp. 2d at 376 (quoting <u>Cendant Corp. v. Shelton</u>, 474 F. Supp. 2d 377, 381 (D. Conn. 2007)).  Further, "[d]espite the generally rigid requirement [of Rule 9(b) ], allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge."  <u>United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.</u>, 865 F.3d 71, 81–82 (2d Cir. 2017) (quoting <u>Wexner v. First Manhattan Co.</u>, 902 F.2d 169, 172 (2d Cir. 1990)).  "Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject."  <u>Id.</u> at 82 (5C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1224 (3d ed. April 2017 Update)).  Similarly, when allegations are offered based on "information and belief", the alleged factual predicates must give rise to a strong inference of fraud.  <u>See</u> <u>id.</u>

To give rise to a strong inference, the "pleader may rely on 'badges of fraud . . . [,] circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent.'"  <u>Carney v. Lopez</u>, 933 F. Supp. 2d at 379 (quoting <u>In re Sharp Int'l</u>, 403 F.3d 43, 56 (2d Cir.2005)).  "Badges of fraud" include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the

transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

In re Anderson, 623 B.R. 199, 213–14 (Bankr. D. Conn. 2020) (quoting In re Kupersmith, 614 B.R. 428, 438 (Bankr. D. Conn. 2020)); see also In re Kaiser, 722 F.2d 1574, 1582–83 (2d Cir. 1983); Carney v. Lopez, 933 F. Supp. 2d at 379 (citing In re Sharp Int'l, 403 F.3d at 56).  In sum, Rule 9(b) does not require particularity with respect to allegations regarding the defendant's scienter or allegations made upon "information and belief".  The plaintiff need only plead sufficient factual predicates to give rise to a strong inference of fraud.

Moreover, "the adequacy of particularized allegations under Rule 9(b) is . . . case- and context-specific."  United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017) (quoting Espinoza ex rel. JPMorgan Chase & Co. v. Dimon, 797 F.3d 229, 236 (2d Cir. 2015)).  Particularly relevant here is that courts in this Circuit relax Rule 9(b)'s particularity requirement for bankruptcy trustees because they are "outsider[s] to the transaction[s] who must plead fraud from second-hand knowledge."  In re Anderson, 623 B.R. 199, 214 (Bankr. D. Conn. 2020) (quoting In re Bos. Generating LLC, 617 B.R. 442, 472 (Bankr. S.D.N.Y. 2020)).

Here, the Trustee pled with particularity that Nash Engineering's fraudulent intent is evidenced, inter alia, as follow: (1) Nash Engineering was insolvent or rendered insolvent as a result of the transfers to its insiders of all of its cash assets, for which no value was exchanged; (2) at the time of the transfers, Nash Engineering was under the control of the recipients; (3) the transfers were concealed; and (4) Nash Engineering

27

had already been subject to asbestos-related litigation and was threatened with further litigation.  See Am. Compl. ¶ 62; see, e.g., id. ¶¶ 24-55.  The factual predicate allegations in the Amended Complaint include, inter alia, that: (1) Nash Engineering transferred its assets to its then-sole shareholder, Nash Holdings, rather than preserve them to satisfy then-pending or reasonably foreseeable asbestos claims, see id. ¶¶ 40, 49, 78; (2) after the transfers, Nash Engineering solely existed to process asbestos claims; see id. ¶ 45; (3) after 2011, Nash Engineering only retained inadequate insurance coverage to process asbestos claims, see id. ¶ 23; (4) Nash Engineering's continued existence prevented potential creditors from discovering the transfers and thus "r[a]n out [ ] the clock" on potential claims from creditors to avoid the transfers, see id. ¶¶ 46, 52; (5) Nash Engineering knew that asbestos creditors would not be aware of their asbestos claims until being diagnosed many years after exposure, see id. ¶¶ 54-55; and (6) Nash Engineering knew or should have known that its liabilities from asbestos claims far exceeded the funds available under its insurance policies, see id. ¶¶ 41, 47.  Thus, the Trustee clearly satisfies Rule 9(b) by alleging badges of fraud including, but not limited to, lack of consideration, close relationship between parties, pattern of conduct or series of transactions following rise in litigation, and pendency of, and predictably of, further asbestos-related claims.  See, supra, at 26.

In their Reply, the defendants argue that the Trustee must assert additional facts to support the fraudulent transfer claim because the transfers were made as "a result of an arm's length, heavily publicized transaction with a publicly traded company decades ago."  See Reply at 9.  As the court already discussed, supra, see Section IV.B.1., the public documents pertaining to the merger do not discuss the transfers from Nash

Engineering to Nash Holdings.  Nor is it clear, in this particular case, how the transfers from Nash Engineering to Nash Holdings are necessarily implicated by the Nash Elmo and Gardner Denver merger.  The Trustee's fraudulent transfer claims are based on the transfers of cash proceeds to Nash Holdings, not the public transaction between Nash Engineering and Gardner Denver.  At this stage, there is no indication from the face of the Amended Complaint that the transfers were a result of the Gardner Denver merger.

Accordingly, the court denies the defendants' Motion as to the actual fraudulent transfer CUFTA claim in Count I.

### 2.    Unjust Enrichment (Count IV)

In Count IV, the Trustee asserts an unjust enrichment claim against Nash Holdings.  See Am. Compl. ¶¶ 82-84.  Under Connecticut law, a right of recovery for unjust enrichment is "a broad and flexible remedy" and "is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another . . . ."  Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573 (2006) (quoting Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83 (1994)).  A plaintiff asserting an unjust enrichment claim must plausibly allege that "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiff[ ] for the benefits, and (3) that the failure of payment was to the plaintiff['s] detriment."  See id. (quoting Hartford Whalers Hockey, 231 Conn. at 283).

The defendants argue that the Trustee has failed to allege the requisite elements of his unjust enrichment claim.  See Mem. at 24.  Specifically, they assert that the Trustee did not allege that Nash Holdings "unjustly failed to compensate Nash in some manner and that Nash suffered some detriment as a result".  See id.  In response, the

Trustee contends that the Complaint contains allegations that Nash Holdings was unjustly enriched by the transfers to the detriment of Nash Engineering's creditors.  See Opp. at 22-23.

In his Amended Complaint, the Trustee alleges that: (1) as a result of the transfers and at the expense of the Trustee and Nash Engineering's creditors, Nash Holdings "has been enriched in the amount of at least $57,720,000.00, to which it was not entitled to"; and (2) Nash Engineering "would be unjustly enriched . . . if it were permitted to retain the benefits" of the transfers.  See Am. Compl. ¶¶ 83-84.  The Trustee further reasserts and realleges all preceding allegations in the Amended Complaint.  See id. ¶ 82.

The same allegations that support the existence of badges of fraud also support the necessary elements of the Trustee's unjust enrichment claim.  According to the Amended Complaint, Nash Holdings and then the other defendants were benefitted by virtue of receiving the assets transferred from Nash Engineering; the defendants did not provide value in exchange for such transfers; and as a result of these transfers, Nash Engineering would not be able to pay liability and defense costs associated with asbestos claims against the company.

Accordingly, the court denies the defendants' Motion to Dismiss the unjust enrichment claim in Count IV for failure to state a claim.

3.     Recovery of Subsequent Transfers (Count V)

In Count V, the Trustee seeks to recover, pursuant to section 52-552i(b) of the Connecticut General Statutes and section 550(a)(2) of the Bankruptcy Code, subsequent transfers from Nash Holdings to its members and any further transfers among the members.  See Am. Compl. ¶¶ 85-88.

In support of their Motion to Dismiss Count V, the defendants advance two arguments: (1) the Trustee has failed to state a claim for actual or constructive fraud in Counts I-III; and (2) the allegations do not meet the specificity requirements of Rules 8 and 9(b).  See Mem. at 25.  Because the defendants' first argument raises the issue of the extent of the reliance, if any, of the claim for recovery of subsequent transfers in Count V on the claims in Counts I-III, the court will first discuss the scope of section 550 before addressing the defendants' specific arguments.

Section 550(a) of the Bankruptcy Code provides, in relevant part:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a)(2).  A plaintiff asserting a claim under section 550(a) need only prove that a transfer is avoidable and not first "obtain[ ] a litigated judgment of avoidance."  Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 501 B.R. 26, 31–37 (S.D.N.Y. 2013) (hereinafter "Sec. Inv.").  Plaintiffs may prove avoidance for purposes of recovering transfers under section 550(a) in two ways: (1) by relying on a separate claim for avoidance, or (2) proving a given transfer is avoidable as an element of the claim for recovery.  See id.  Under the first path, the plaintiff can proceed against the initial or subsequent transferee because "[a]voidability is an attribute of the transfer and not the party."  Id. at 31 (quoting In re AVI, Inc., 389 B.R. 721, 733 (BAP 9th Cir. 2008)); see also In re Continuity X, Inc., 582 B.R. 124, 135 (Bankr. S.D.N.Y. 2018).  The second path is permitted by section 550(a) because the language, "to the extent avoided" does not invoke a temporal requirement that a plaintiff first litigate avoidance of a given transfer before seeking recovery; instead, it provides a limitation on recovery,

i.e., a plaintiff may only recover the portion of a transfer that is avoided.  Sec. Inv., 501

B.R. at 31–32 (agreeing with the conclusion of other courts that "the 'to the extent'

language 'simply recognizes that transfers sometimes may be avoided only in part, and

that only the avoided portion of a transfer is recoverable'" "in light of the overall structure

of the Bankruptcy Code's avoidance and recovery provisions" (quoting In re AVI, Inc.,

389 B.R. at 77)); see also In re Continuity X, Inc., 582 B.R. at 135 (noting that to recover

a transfer, a trustee must, at a minimum, prove that a transfer is avoidable "at least

contemporaneously with the recovery action" (quoting Sec. Inv., 501 B.R. at 33)

        In the instant case, Count V seeks recovery of the transfers received by Nash

Holdings and subsequently transferred to its members.  See Am. Compl. ¶¶ 85-88.

Almost all the allegations in Count V, e.g., id. ¶¶ 86-88, specifically pertain to the

subsequent transfers and, taken together, allege that Nash Holdings distributed the

transfers received from Nash Engineering to the members, who did not receive the

assets in good faith or in exchange for value.  However, the Trustee also expressly

incorporates all preceding allegations in the Amended Complaint.  See id. ¶ 85 ("The

Trustee reasserts and realleges the foregoing paragraphs of this Complaint as if full set

forth herein.").  This incorporation can reasonably be interpreted as the Trustee basing

the recovery claim in Count V on the avoidance claims in Counts I-III.  On the other

hand, it is also reasonable to interpret this incorporation as reasserting the factual

allegations, which could, in theory, support a theory of avoidance not encompassed in

Count I.  In other words, the Trustee has not foreclosed either path available under

section 550, allowing him to prove the transfers are avoidable for purposes of recovery

under section 550 by relying on: (1) Count I against Nash Holdings, or (2) another

32

theory of avoidance that has not already dismissed in the instant Ruling.  Thus, even if

Count I were dismissed, Count V would survive, provided a theory of avoidance under,

inter alia, section 544 can be plausibly inferred from the factual allegations.[9]  For

instance, although the Trustee did not assert a constructive fraudulent transfer claim

under CUFTA in the Amended Complaint, he could recover the subsequent transfers if

he proves, pursuant to his strong-arm powers in section 544, the initial transfers were

constructively fraudulently conveyed.  See Geriatrics, Inc. v. McGee, 332 Conn. 1, 11-

12 (2019) (holding that CUFTA encompasses claims for constructive fraudulent

transfer).

Given the foregoing and the fact that the instant action and No. 23-CV-1366

(JCH) constitute a complex set of litigation that will involve significant efforts by counsel

on both sides, the court wishes to clarify the exact scope of the Trustee's claims in

Count V.  As such, the court orders the Trustee to provide a clarification, within 21 days,

regarding the extent to which Count V depends on Count I and what, if any, alternative

theories of avoidance he is pursuing in Count V.  In this clarification, the Trustee is

further ordered to direct the court to the factual allegations in the Amended Complaint

that support the avoidance theories he identifies or, if necessary, move to amend the

---

[9] The individual defendants, i.e., the subsequent transferees, may argue that the Trustee has
failed to prove the initial transfers are avoidable as well as assert applicable affirmative defenses that the
initial transferee may have.  See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 501 B.R. 26, 35
(S.D.N.Y. 2013) (noting that a subsequent transferee can assert "defense[s] to avoidance available to an
initial transferee, unless collateral estoppel and res judicata apply").  However, because the Trustee has
already met the two-year statute of limitations of section 546, the individual defendants would not have a
statute of limitations defense regarding avoidance. See Sec. Inv., 501 B.R. at 34 (holding that a
subsequent transferee only has a statute of limitations defense to avoidance if the trustee "failed to bring
any avoidance action with respect to the initial transfer (against either the initial or subsequent transferee)
within section 546(a)'s two-year limitations period" (emphasis added)); In re Continuity X, Inc., 582 B.R.
124, 136 (Bankr. S.D.N.Y. 2018) (holding that the subsequent transferee had no limitations
defense to the avoidance element of the trustee's recovery action because the trustee had timely
commenced an avoidance action against the initial transferees before discovering that the initial
transferees were no longer operating entities).

Amended Complaint solely with respect to Count V to assert any other possible avoidance theories.  In turn, the defendants may respond to any arguments made by the Trustee that the factual allegations in the Amended Complaint support the theories of avoidance the Trustee claims are subsumed in Count V.  In the event the court grants a motion to amend, the defendants may file a motion to dismiss on new grounds that may arise by amendments to the Amended Complaint.

The court now turns to the defendants' arguments.  The defendants first argue that Count V must be dismissed because the Trustee has failed to state a claim of fraudulent conveyance in Counts I-III.  See Mem. at 25.  Because the Trustee's claim of actual fraudulent transfer in Count I survive, the court denies the defendants' Motion to Dismiss Count V on this ground.

The defendants next contend that, because the Trustee's allegations are made "upon information and belief" and do not specify the property conveyed, the timing and frequency of the transfers, and the consideration paid, Count V does not satisfy the specificity requirements of Rules 8 and 9(b).  See Mem. at 25.  However, the defendants' assumption that the recovery of transfers must be pled with particularity is based on a misinterpretation of the caselaw on which they rely for support.  The defendants cite to In re M. Fabrikant & Sons, Inc., 394 B.R. 721 (S.D.N.Y Bankr. 2008) for the proposition that Rule 9 applies to allegations pertaining to recovery from subsequent transferees.  Although the court in In re M. Fabrikant & Sons, Inc. took note of the vagueness of the allegations pertaining to the subsequent transfers, its holding that the plaintiff cannot recover from a subsequent transferee was based on the fact that the "claims that the initial transfers were made with actual fraudulent intent fail[ed]" for

lack of specificity.  See 394 B.R. at 740 (emphasis added).  Here, the Trustee satisfies

Rule 9(b) as applied to his actual fraudulent conveyance claims in Count I.  See, supra,

Section IV.C.1.  Thus, insofar as Count V depends on Count I, dismissal is not

warranted.  As support for the proposition that the Trustee must specifically plead

details pertaining to the transfers, e.g., timing and frequency of the transfers and

consideration paid, the defendants rely on Quantum Sail Design Group, LLC v. Liberty

Enterprises, Inc., No. 3:03-CV-281 (WWE), 2004 WL 1202721 (D. Conn. Mar. 26,

2004).  See Mem. at 25.  In Quantam Sail Design Group, the court held that a

subsequent transferee may assert a defense of "good faith" in response to a CUFTA

claim for recovery of subsequent transfers.  See 2004 WL 1202721, at *3.  This case is

unfavorable to the defendants' argument as it confirms the Trustee's argument that

"good faith" is a defense and not an element of a claim for recovery of subsequent

transfers.  See id.; see also Opp. at 24.

Moreover, tthe defendants incorrectly assume that the Trustee cannot plead

based on "information and belief".  As discussed supra, see Section IV.C.1., the Trustee

can rely on information made "upon information and belief" in light of his status as "an

outsider to these transactions", who will predictably "need discovery to identify the

specific [s]ubsequent [t]transfers by date, amount and the manner in which they were

effected".  See Sec. Inv., 501 B.R. at 36 (quoting Picard v. Chais, 445 B.R. 206, 236

(Bankr. S.D.N.Y. 2011)).

Accordingly, the court denies the defendants' Motion to Dismiss the Trustee's

state and federal claims for recovery of subsequent transfers in Count V.

The Trustee is ordered to file a clarification with the court, within 21 days, regarding Count V and direct the court's attention to the factual allegations supporting any theories of avoidance that the court has not identified as encompassed in Count I and that survive the Motion to Dismiss.  In addition, the Trustee may move to amend the Amended Complaint in conjunction with the clarification.

     D.    Leave to Amend

The defendants argue that the court should dismiss the Amended Complaint with prejudice because the Trustee lacks standing to pursue the fraudulent conveyance claims in Counts I and V and all of his claims are time-barred: such substantive defects cannot be cured by repleading.  See Mem. at 26.  Because the court concluded that the Trustee has standing to pursue the claims in Counts I and V, the court will only address the last argument.

"It is the usual practice upon granting a motion to dismiss to allow leave to replead."  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).  However, "where a plaintiff is unable to allege any fact sufficient to support [his] claim, a complaint should be dismissed with prejudice."  See id.  With respect to the defendants' Motion to Dismiss on timeliness grounds, the court granted the Motion as to Counts II and III and denied the Motion as to Counts I, IV, and V.  Thus, here, the court must determine whether the plaintiff can allege any facts sufficient to state a claim under the statutes at issue in Counts II and III.

The court granted the Motion as to Counts II and III for failure to meet the statutory element of section 548 of the Bankruptcy Code, see, supra, Section IV.B.2., which only permits the Trustee to avoid transfers made on or within two years of October 19, 2021, the date of the bankruptcy petition.  Because the two-year period at

issue in section 548 is a statutory requirement not subject to waiver or equitable estoppel, In re Stanwich, 488 B.R. at 835; see also, supra, Section IV.B.2., the Trustee cannot allege any set of facts that would allow him to avoid the 2004-2011 transfers under section 548.  As such, the court grants the defendants' Motion to Dismiss with prejudice as to the claims in Counts II and III.

## V.    CONCLUSION

For the reasons stated above, the court grants in part and denies in part the Motion to Dismiss (Doc. No. 17).  The Motion is granted insofar as it seeks dismissal of the claims made pursuant to the Bankruptcy Code in Counts II and III with prejudice. The Motion is otherwise denied.

The remaining claims against Nash Holdings are the actual fraudulent transfer claim under CUFTA and sections 544 and 550 of the Bankruptcy Code in Count I and the unjust enrichment claim in Count IV.  The remaining claims against the shareholders are for recovery of subsequent transfers under section 52-552i(b) of the Connecticut General Statutes and section 550(a)(2) of the Bankruptcy Code in Count V.

Further, the court orders the Trustee to file, within 21 days of this Ruling, a clarification regarding the precise contours of his claim under section 550(a)(2) in Count V, and he may move to file a Second Amended Complaint if he seeks to expressly plead any additional claims under Count V.

**SO ORDERED.**

Dated at New Haven, Connecticut this 15th day of July 2024.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

37